## TUG No. 13.

### THE BUFFALO.

### HYLAND v. TUG No. 13 AND THE BUFFALO.

*(District Court, S. D. New York. April 29, 1892.)*

COLLISION—LIGHTS—OBSCURATION BY TOW.

A tugboat, called "No. 13," was going up the North river, with a barge on her port side. The pilot house of the barge hid the red light of the tug from the tug Buffalo, which was crossing from Jersey City to New York, and had No. 13 on her starboard hand, so that the vessels were not seen till within 400 or 500 feet of each other. The vessels in tow of the tugs collided. *Held,* that No. 13 was navigating in violation of the rule that requires lights to be visible for 10 points around the horizon; that she took the risk of such condition of her lights, and was solely liable for the collision.

In Admiralty. Libel by Josiah A. Hyland against the steam tug Buffalo and Tug No. 13 for collision. Decree for libelant against Tug No. 13.

*Hyland & Zabriskie,* for libelant.

*Wilcox, Adams & Green,* for The Buffalo.

*Frank Loomis* and *Mr. Mosher,* for The Tug

BROWN, District Judge. At a little before 4 o'clock in the morning of December 29, 1891, as the steam tug Buffalo, with two floats, one on each side, loaded with railroad cars, was on her way from the dock above Pavonia ferry, Jersey City, to Duane street, N. Y., her starboard float came in collision with the libelant's barge Verona, which was going up the North river in tow of Tug No. 13, and on her port side, at a point about 400 feet off from, and a little above, the Duane street pier. The starboard bow of the Buffalo's starboard float struck the port bow of the Verona, and caused damages for which the above libel was filed.

The weather was clear and mild. The courses of the two tugs were crossing each other so as to involve risk of collision. The Buffalo had No. 13 on the starboard hand, and it was the duty of the former to keep out of the way, provided she had means of knowing of the approach of No. 13 and her tow. The defense of the Buffalo is that she had no means of knowing this; because, as she contends, the red light of No. 13, which ought to have been visible to apprise her of the presence and of the course of No. 13, was obscured by the pilot house of the barge on the port side of No. 13, until too late to avoid collision.

The evidence shows that the pilot house of the Verona was higher than the colored lights of No. 13, which were on the pilot house of the latter;

that the red light of No. 13 was visible from straight ahead to one point off her port bow; that between one and two points off her port bow, or more exactly for ten degrees of arc beyond one point the port light was obscured, but became visible again from about two points off the port bow. For the Buffalo it is claimed that in coming across the river she was all the time in the shadow of the Verona's pilot house, as respects the port light of No. 13. Diagrams have been submitted illustrating this contention. No. 13 came up from the Battery in line with the shore at a distance of 500 or 600 feet from the piers, until shortly before reaching the Chambers street slip, when she hauled in a little towards the New York shore to allow an Erie ferryboat, going out of the Chambers street slip, to pass ahead of her. Upon this general course the diagram shows that the port light would be obscured at least until No. 13 changed her heading towards the New York shore, provided the speed of No. 13 was five knots or over, that of the Buffalo being about three knots.

The pilot of No. 13 says he was going about 4½ or 5 knots an hour. The counsel for No. 13 argues that this is too high an estimate; but as her time after leaving Dock street at 3:15 A. M. could have been only from 30 to 40 minutes, it seems to me that taking into account the differences of the tide in the North and East rivers, her speed up the North river must have been rather above five knots than below it. It was high water that day at Governor's island a few minutes before 7 A. M. At the time the Buffalo crossed the North river, the current had, therefore, only just begun to run flood in mid river, (*The Ludvig Holberg*, 36 Fed. Rep. 917, note, 3, 9,) though running up a half hour earlier along shore; and this was the reason, no doubt, why No. 13 in going up kept so near the New York docks. In the East river, where the flood current sets up river more than an hour earlier, No. 13 would have encountered the flood current in its second hour, running at least 1½ knots; while along the North river shore she had a current of about one knot in her favor. From these facts I infer a probable speed in No. 13 of at least five knots in the North river. This speed, as stated above, would make the relative positions of the boats such that the colored lights must have been for the most part obscured to each other.

This is confirmed by the answer of No. 13, and also by the testimony of both pilots, that neither saw the colored light of the other until after the ferryboat, which crossed between the two, had cleared and had disclosed the two tugs within about 400 feet of each other. The testimony of the pilot of the Buffalo to this fact, is unqualified. The testimony of the pilot of No. 13 is a little obscure; but the only specific and unambiguous question and answer on this point are to the effect that he did not see the green light of the Buffalo until after the ferryboat had crossed.

"*Question.* How far from you did she [the Buffalo] appear to be when you first noticed the green light, or how far did you judge her to be? *Answer.* Up the river; further up?

"*Q.* Yes. *A.* In the neighborhood of 400 or 500 feet.

"*Q.* Was that before the ferryboat crossed between you? *A.* No, sir."

The answer of No. 13 states explicitly that "*as soon as* the green light and staff lights were seen, a signal was given;" and all agree that no signal was given until after the ferryboat had crossed. If the pilot of No. 13, moreover, intended to be understood as saying in his subsequent testimony that he saw not only the two white lights, but also the *green* light of the Buffalo 1,000 feet or more out in the river, and before the ferryboat passed, this would convict No. 13 of gross fault in not signaling to the Buffalo and her tow when they were recognized so near, and so plainly involving risk of collision. Although signals are often unreasonably delayed, I am not willing to believe that in the case of heavy floats like these, where the need of a signal when the vessels are first seen only a thousand feet distant is so imperative, a signal would have been omitted by the pilot of No. 13, had he seen the Buffalo's green and staff lights before the ferryboat crossed. I conclude, therefore, that neither pilot saw the colored light of the other until after the ferryboat had passed, because the colored lights were not visible, through the obscuration caused by the pilot house of the barge on the port side of No. 13.

For this obscuration No. 13 was responsible, and she must take the risk of navigating in that condition of her lights, and of her tow; because it was in violation of the rule of navigation that requires lights to be *visible* for 10 points around the horizon. *The Seacaucus*, 34 Fed. Rep. 68, 70. No fault being established against the Buffalo, the libel as to her must be dismissed with costs; and a decree entered against No. 13, with costs, with an order of reference to compute the damages, if not, agreed upon.